UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TERRY R. COLE,                          )
                                        )
            Plaintiff,                  )
                                        )
       v.                               )    Case No. 4:10CV283 HEA/FRB
                                        )
MICHAEL J. ASTRUE, Commissioner         )
of Social Security,                     )
                                        )
            Defendant.                  )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.  All
pretrial matters were referred to the undersigned United States
Magistrate Judge for appropriate disposition pursuant to 28 U.S.C.
§ 636(b).

**I.  Procedural History**

        On July 19, 2007, plaintiff Terry R. Cole ("plaintiff")
filed an application for Disability Insurance Benefits pursuant to
Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and
an application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. (Administrative
Transcript ("Tr.") at 79-86).  His applications were initially
denied, and he requested and received a hearing before an
administrative law judge ("ALJ") on January 15, 2009.[1]  (Tr. 10-

---

[1]This case was one designated as a Disability Redesign Prototype case,
originating in Missouri, for which no reconsideration determination was
necessary before plaintiff's case was elevated to the hearings level.  20

-1-

33).  On February 26, 2009, the ALJ issued a decision denying plaintiff's applications, (Tr. 10-16), and plaintiff filed a Request for Review of Hearing Decision/Order with defendant Agency's Appeals Council which, after reviewing additional medical evidence submitted by plaintiff's counsel, denied plaintiff's request for review on December 31, 2009.  (Tr. 1-5).  The ALJ's decision thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

### A.  Plaintiff's Testimony

Plaintiff's administrative hearing was held on January 15, 2009.  At the outset, plaintiff's counsel stated that plaintiff was amending his onset date to June 17, 2007, his 50th birthday. (Tr. 20).

Plaintiff testified that he was 51 years of age, and that he had last worked in March of 2007 as a security officer, a job which involved walking, sitting, and restraining patients.  (Id.) Plaintiff testified that he was let go because he did not fulfill his duties as required.  (Id.)  Before this, plaintiff worked for 17 to 18 years in maintenance, which involved carrying and installing tubs, sinks, hot water tanks, replacing refrigerators and stoves, hanging doors, window frames, and concrete patching. (Tr. 20-21).

Plaintiff testified that he had been having problems with

---

C.F.R. §§ 404.906 and 416.1406.

his lower back and right knee for over ten years, but the problems had worsened. (Tr. 21). He stated that his knee pain occurred daily; characterized it as aching and sometimes stabbing; and testified that it sometimes went up into his hip and down into his "lower feet," making it hard to remain stable. (Tr. 22). Plaintiff testified that he lacked strength in his knee, and noticed this when using stairs, getting in the car, or carrying groceries or trash. (Id.) Plaintiff's attorney asked plaintiff to rate his average daily pain on a 1 to 10 scale, with 1 representing no pain at all, and 10 representing pain "so severe you're screaming for medication in the  hospital, it's really bad," and plaintiff answered "I'd say a 11 or 12." (Id.) Plaintiff testified that his pain was so severe that he could not walk at all or hold his weight, and that he also had symptoms in his left knee. (Tr. 23). Plaintiff testified that, when he was "walking long distance or climbing a step constantly or walking period," his knee felt like "bone to bone," and that it "slips or it pops and sometime [sic] it swells." (Id.) When asked what he did to relieve the pain, plaintiff testified that he sat down and wrapped his knee with a bandage, sat in Epsom Salt and water, and used rubbing alcohol, witch hazel, and Aspercreme. (Tr. 23). Plaintiff testified that his doctors had been giving him Percocet, Vicodin, Tylenol 3 "on and off for about four years," and that the treatments and medications provided temporary relief but did not stop the pain. (Tr. 23-24). Plaintiff testified that he had been told he required surgery. (Tr. 24). Plaintiff was noted to be

using a cane at the hearing, and testified that he used it when his knee became too weak to support his weight, and to balance his weight. (Id.) Plaintiff testified that he had been using a cane on and off since 2002, but that he had been using it more frequently since late 2006 to 2007. (Tr. 25). Plaintiff testified that he used the cane every day or every other day, when he was carrying trash out, climbing steps, or walking a long distance. (Tr. 25).

Plaintiff testified that he also suffered from stabbing pains in his lower back, and stated that he had been going to the emergency room on and off for awhile, and that sometimes the pain was so bad that he had to drag his right leg. (Id.) Plaintiff testified that the pain radiated down his legs and up into his neck and arm and felt paralyzing. (Tr. 26). Plaintiff testified that he had been experiencing this pain for over five and one-half years, and that lying down does not make it go away. (Id.) Using the same 1 to 10 scale described earlier, plaintiff rated his back pain at a 15. (Id.)

When asked whether any activities exacerbated his back pain, plaintiff testified that, if he lifted too much for too long, he experienced pain and had to stop. (Tr. 26-27). Plaintiff testified that he tried to exercise "on a machine in the basement" to help his back pain, which helped sometimes, but the pain always returned. (Tr. 27). Plaintiff testified that the only thing that relieves the pain was "the pain medicine that the doctor prescribed for me." (Id.)

Plaintiff testified that he had experienced problems with prostatitis, and that he was presently taking Gabapentin and Tramadol. (Tr. 27-28; 31). He testified that he had pain every day that did not end, and that he was currently receiving treatment at a clinic. (Tr. 28).

Plaintiff described his daily activities as sitting at home watching TV, playing on the computer, and trying to walk around. (Tr. 29). Plaintiff testified that he lived with a friend, and had been homeless before this arrangement. (Id.) He testified that he tried to sweep or vacuum and take out the trash, but did not do laundry or cooking. (Id.)

Plaintiff testified that he could sit in a chair for about 30 minutes, could stand and move around for at least 45 minutes, and could lift 25 pounds. (Tr. 29-30). He testified that he had to lay down due to pain in his back. (Tr. 30-31).

Plaintiff then responded to questions from the ALJ. Plaintiff testified that he had a work-related accident in May of 2003, and received a workers' compensation settlement and unemployment benefits. (Tr. 31-32). He testified that he has no income, but received food stamps. (Tr. 32).

B.  Medical Records[2]

---

[2]The following summary includes medical evidence which was submitted to the Appeals Council and was not before the ALJ. This evidence consists of a urology progress note dated November 16, 2007 from St. Louis ConnectCare Community Health Center (the Appeals Council noted November 19, an incorrect date); a urology progress note dated June 2, 2009 from St. Louis University Hospital; medical records dated July 29, 2009 through September 15, 2009 from St. Louis University Hospital; and medical records dated July 14, 2009 from St. Louis University Hospital. (Tr. 4). For the sake of continuity,

Records from the Division of Workers' Compensation indicate that, on September 22, 2003, plaintiff received a settlement of 7.5% of the body as a whole relative to his low back, and 2.5% of the right leg, and that this settlement was related to an accident that occurred on or about February 17, 2003. (Tr. 168-69). The Division's records further indicate that plaintiff received another settlement of 15% of the left knee, related to an accident that occurred on or about July 9, 2004. (Tr. 169).

Records from St. Louis ConnectCare Community Health Centers ("ConnectCare") indicate that plaintiff was seen in the orthopedic clinic on February 4, 2004 with complaints of right knee pain. (Tr. 287). It was noted that he was taking Hydrocodone.[3] An MRI was ordered, and plaintiff was prescribed Darvocet.[4] (Tr. 289).

Records from Barnes Jewish Hospital and the Mallinkrodt Institute of Radiology indicate that a February 24, 2004 MRI of plaintiff's right knee revealed an anterior cruciate ligament ("ACL") tear, and mild osteoarthritis with a full thickness tear of the medial femoral articular cartilage. (Tr. 162, 165.) Plaintiff returned to ConnectCare on March 18, 2004 for a follow-up appointment, and complained of "stabbing pain" and "acute aching

discussion of these medical records is incorporated into the following summary of the medical information of record.

[3]Hydrocodone is a narcotic analgesic.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html

[4]Darvocet is a narcotic analgesic.
http://www.nlm.nih.gov/medlineplus/druginfo/drug_Da.html

pain," but the records are not specific as to the parts of the body to which these complaints refer. (Tr. 286). It is noted that the February 24, 2004 MRI revealed an "old ACL tear" in plaintiff's knee. (<u>Id.</u>) Plaintiff was given Darvocet. (<u>Id.</u>)

Plaintiff returned to ConnectCare on May 24, 2004 with complaints of recurrent tonsilitis. (Tr. 284-85). It was noted that plaintiff may have obstructive sleep apnea, and a sleep study was ordered. (Tr. 285).

On August 6, 2004, plaintiff was seen at ConnectCare with complaints of chronic twitching in his left eye after falling from a ladder. (Tr. 281-82). On September 8, 2004, plaintiff was seen with complaints of swelling and popping in his knees, and it is noted that his medication had changed from Darvocet to Hydrocodone. (Tr. 280). Plaintiff was tender in his left knee, with no effusion. (<u>Id.</u>)

Records from Barnes Jewish Hospital and the Mallinkrodt Institute of Radiology indicate that a September 14, 2004 MRI of plaintiff's lumbar spine revealed mild facet arthropathy at the L5-S1 level, but was otherwise normal. (Tr. 160, 164). An October 1, 2004 MRI of plaintiff's left knee revealed a complete ACL tear and focal chondrosis and cartilage thinning along the weight-bearing aspect of the medial femoral condyle. (Tr. 156, 166). An MRI of the right knee, performed on this same date, revealed post-operative changes with progressive worsening and very little cartilage remaining along the articular surfaces of the medial compartment, degeneration and fraying of the lateral meniscus, and

cyst development.  (Tr. 158-59, 167).

On December 13, 2004, plaintiff was seen in the renal clinic at ConnectCare, stating he was there for a follow-up appointment.  (Tr. 274).  Plaintiff complained of pain over the right hip and flank.  (Id.)  Lab tests were ordered, and plaintiff was advised to return in three months.  (Tr. 275).

ConnectCare records indicate that plaintiff presented on January 7, 2005 with complaints of bilateral knee pain, and requested pain relief.  (Tr. 269-70).  Plaintiff's knees were tender, and he was diagnosed with chronic knee pain.  (Id.) Plaintiff was seen again on January 21, 2005 with complaints of acute tonsillitis, sore throat, and chronic knee pain, and was requesting pain medication.  (Tr. 266-67).  Upon examination, plaintiff's tonsils were enlarged and red, and his knee was swollen with diffuse tenderness but no redness.  (Tr. 266).  He was diagnosed with acute tonsilitis, and given an antibiotic and Tylenol.  (Id.)

On February 2, 2005, plaintiff was seen at ConnectCare with complaints of right knee pain, and it is noted that plaintiff reported that he was seen in orthopedic surgery for possible knee surgery.  (Tr. 186).  It is noted that plaintiff wanted pain medication.  (Id.)  Plaintiff was told to make an appointment with Dr. Ahmed or Dr. Nayak in the next three to four weeks, and that "I will not be able to write pain meds again."  (Id.)

On February 25, 2005, plaintiff was seen at ConnectCare with complaints of numbness on the left side of his head and pain

in his knees and back. (Tr. 187). It appears that plaintiff was given prescription medication. (Id.)

On March 17, 2005, plaintiff was seen at ConnectCare for follow-up, and reported feeling fine. (Tr. 261). Similarly, on March 28, 2005, plaintiff was seen at ConnectCare for follow-up, and reported feeling fine. (Tr. 259). He was advised to return as needed. (Id.)

On April 21, 2005, plaintiff was seen in the Urgent Care Center at ConnectCare with complaints of upper epigastric pain and mid-sternum pain for several minutes radiating to the left arm. (Tr. 179-80). Plaintiff was tender on both knee joints, and it is noted that approval for orthopedic care was pending. (Tr. 179). Plaintiff was given Protonix[5] and Tylenol #3.[6] (Id.)

On May 12, 2005, plaintiff was seen at ConnectCare with complaints of a burning sensation in his chest, hoarseness, sore throat, and dry cough. (Tr. 250-51). On June 9, 2005, plaintiff missed an appointment in the orthopedic clinic at ConnectCare. (Tr. 249).

On July 21, 2005, plaintiff was seen in the orthopedic clinic at ConnectCare for follow-up of complaints of bilateral knee pain. (Tr. 246). It is noted that plaintiff's history was vague and not accurate and that he was unable to remember the treatment

---

[5]Protonix, or Pantoprazole, is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and injury of the esophagus. It is also used to treat conditions where the stomach produces too much acid. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html

[6]Tylenol 3 is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681004.html

he had received. (Tr. 247). It is noted that plaintiff "wants pain pills." (Id.) Plaintiff was told to bring past radiological study reports to allow the ConnectCare staff to "get a hold on what is going on," and it is noted that plaintiff left. (Id.)

On July 27, 2005, plaintiff was seen at ConnectCare for routine follow-up, and left knee crepitus was noted. (Tr. 185).

On August 1, 2005, plaintiff missed his appointment in the Gastrointestinal clinic at ConnectCare. (Tr. 245).

On October 29, 2005, plaintiff was seen in the urology clinic at ConnectCare with complaints of scrotal pain. (Tr. 277). His history of knee pain and chronic tonsillitis is noted. (Id.) He was diagnosed with an epididymal cyst/spermatocele (a cyst-like mass that forms in the epididymis), and advised to take Motrin and undergo an ultrasound. (Id.)

On December 2, 2005, plaintiff was seen at ConnectCare with complaints of a sore, painful area on the left side of his neck that radiated to his head, tonsil pain, sore throat, chills, and muscle spasm in his shoulders. (Tr. 240-41). He was given Flexeril.[7] (Tr. 242).

Plaintiff was seen at ConnectCare on September 7, 2006 with complaints of back pain that radiated to the neck and did not respond to pain medication, and described the pain as constant and

_____

[7]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

stabilizing.[8]  (Tr. 232).   He was noted to be in acute distress.
(Tr. 233).  Examination of plaintiff's neck was normal, but muscle
spasm was noted in plaintiff's thoracic and lumbar spine.  (Id.)
Lumbar   spine   films   taken   on   September   7,   2006   revealed
"degenerative changes, lumbar spine.  No fracture or subluxation."
(Tr. 238).  Plaintiff was diagnosed with low back pain and was told
to call or go to the emergency room as needed.  (Tr. 233).  He was
told to be active as tolerated, and to use warm soaks.  (Id.)  He
was  given  a  five-day  prescription  for  Lortab,[9]  and  a  ten-day
prescription for Ibuprofen (Motrin).  (Tr. 234).

        Records  from  the  Grace  Hill  Neighborhood  Health  Center
("Grace Hill")  indicate that plaintiff was seen on October 4, 2006
for  medical  follow-up.   (Tr. 300, 304).   It was noted that
plaintiff had a history of low back pain, and that he could not sit
or stand for a long time.  (Tr. 300).  Plaintiff reported that the
pain  radiated  to  the  right  thigh  at  times,  and  that  Vicodin
relieved the pain.  (Id.)  Plaintiff was given prescriptions for
Flexeril and Vicodin.  (Id.)

        On December 1, 2006, plaintiff was seen in the Neurology
clinic at ConnectCare with complaints of low back pain that was not
controlled  by  over-the-counter  medication.   (Tr. 228).   It was
noted that plaintiff's prior radiological studies of the low back
were normal with mild facet arthropathy at L5-S1, and plaintiff was

---

[8]Plaintiff's amended alleged onset date is June 17, 2007.

[9]Lortab is a combination of Acetaminophen and hydrocodone, and is used
to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

diagnosed with exacerbated chronic back pain that was likely musculoskeletal in nature. (Tr. 229). In the "Problem List" section of the progress note, it is indicated that plaintiff had undergone facial nerve surgery and right knee surgery, and that he was unemployed and occasionally used alcohol and cigarettes. (Tr. 228). It is noted that plaintiff was told that he should bend his knees when lifting. (Tr. 229).

Plaintiff was seen again at ConnectCare on December 8, 2006 by David Clifford, M.D., for follow-up of complaints of low back pain. (Tr. 225-26). It was noted that plaintiff was taking Soma,[10] Elavil,[11] Zantac,[12] and Naproxen.[13] (Tr. 225). Plaintiff reported that he did not tolerate Soma, and had done better on Percocet.[14] (Id.) In the "Problem List" section of the progress note, Dr. Clifford noted past facial surgery and right knee surgery, and that plaintiff did not do well on Ultram,[15] Advil (a

---

[10]Soma or Carisoprodol, a muscle relaxant, is used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682578.html

[11]Elavil, or Amitriptyline, is used to treat symptoms of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html

[12]Zantac, or Ranitidine, is used to treat ulcers; gastroesophageal reflux disease (GERD), and conditions where the stomach produces too much acid. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html

[13]Naproxen, also known by the brand name Aleve, is used to reduce fever and to relieve mild pain from headaches, muscle aches, arthritis, menstrual periods, the common cold, toothaches, and backaches. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

[14]Percocet, or Acetaminophen with Oxycodone, is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601007.html

[15]Ultram, or Tramadol, is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

non-prescription anti-inflammatory medication) or Naproxen. (Tr. 225). Dr. Clifford noted that straight leg raise testing reproduced symptoms of right buttock pain radiating to the back of the right knee. (Tr. 226). Dr. Clifford's diagnosis was right sacroiliitis and musculoskeletal low back pain. (Id.) Dr. Clifford recommended that plaintiff discontinue Soma and continue taking Elavil. (Id.) A ConnectCare Progress Note dated December 8, 2006, written by Beverly West, M.D., indicates that plaintiff was discharged from care to follow up on December 29, 2006 in Neurology, and that plaintiff was given prescriptions and voiced his understanding. (Tr. 227).

On December 29, 2006, plaintiff was seen at ConnectCare for follow-up for chronic back pain. (Tr. 222). The records contain the following notation: "At last visit, he refused all medications due to [illegible] Vicodin. He was given explicit instructions to return today [with] his pill bottle - which he did not do. Reports benefit [with] the pain meds and exercises. Today he is requesting a 'shot.'" (Id.) It is noted that x-ray of the lumbar spine revealed "mild" degenerative joint disease, and that his low back pain was most likely due to a musculoskeletal disorder. (Tr. 223). It is noted that the pharmacy would be contacted to confirm that the narcotic dispensation was within prescription limits. (Id.) Plaintiff was advised to return in three months. (Id.)

On January 3, 2007, plaintiff was seen at ConnectCare with complaints of a sore throat and dry cough. (Tr. 218-19). He

-13-

was diagnosed with acute sore throat and prescribed an antibiotic (Amoxicillin) and Delsym (over-the-counter cough medicine). (Tr. 219).

On February 7, 2007, plaintiff was seen at ConnectCare with complaints of burning upon urination, scrotal pain, and pain in his side bilaterally when inhaling. (Tr. 210-11). A box is checked indicating that plaintiff complained of back pain. (Tr. 211). Chest x-ray revealed a tiny metallic particle in the left lung, but no evidence of active disease in the chest. (Tr. 216). He was diagnosed with acute epididymitis, and prescribed Levofloxicin[16] and Tylenol. (Tr. 212).

On February 18, 2007, plaintiff was seen at Grace Hill with complaints of a history of low back pain. (Tr. 299). His prescriptions were refilled and he was referred for orthopedic evaluation. (Id.)

On May 25, 2007, plaintiff was seen at ConnectCare and reported pain in his stomach and testicles. (Tr. 207). On June 10, 2007, plaintiff was seen at ConnectCare by Dr. Varanasi with complaints of abdominal pain and prostate problems, and reported difficulty breathing and urinating. (Tr. 200). It does not appear that plaintiff complained of back or knee pain. See (Tr. 200-02). Dr. Varanasi noted that overall musculoskeletal findings were normal. (Tr. 201-02). On June 25, 2007, plaintiff underwent a testicular ultrasonogram, which revealed multiple cysts in the

---

[16]Levofloxacin is used to treat certain infections such as pneumonia chronic bronchitis and sinus, urinary tract, kidney, prostate, and skin infections. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697040.html

-14-

epididymides and testicles.  (Tr. 198).

On September 28, 2007, plaintiff presented to Grace Hill to inquire about his urology referral and scrotal ultrasound.  (Tr. 295).  The assessment was prostate problems, and it is indicated that the ConnectCare records would be obtained.  (Id.)

On October 1, 2007, plaintiff was seen at Grace Hill for follow-up to get information about a urology referral.  (Tr. 298).  His Vicodin prescription was refilled because plaintiff stated that his granddaughter had thrown his pills into the toilet.  (Id.)  He was referred to ConnectCare for follow-up for chronic pain secondary to multiple cysts in his testes and epididymides.  (Tr. 293).

On October 10, 2007, plaintiff was seen by Jack C. Tippett, M.D., for an independent evaluation.  (Tr. 341-45).  Dr. Tippett noted that plaintiff gave a poor history, and that it was therefore difficult to determine what was truly important.  (Tr. 341).  Dr. Tippett noted that plaintiff reported being injured at age 13 when he twisted his right knee, and had, since then, experienced problems with that knee.  (Id.)  Plaintiff reported that arthroscopic surgery in 2000 had not helped, and that his knee was weak and caused a lot of discomfort.  (Id.)  Plaintiff also reported suffering from low back pain since falling and hurting his tailbone in 2003, and stated that he had not had surgery but took Hydrocodone.  (Id.)

Dr. Tippett noted that plaintiff appeared to try to cooperate, but guarded against any assisted active range of motion

studies to the extent that very little accurate information could be obtained. (Tr. 341). Plaintiff rose from a chair rather easily, and had a slight limp on his left side while in the examining room, "but as he left the examining room, the limp was not noticed." (Tr. 341-42). Dr. Tippett noted that plaintiff moved his head and neck rather normally, but range of motion could not be assessed, as noted above. (Tr. 342). Plaintiff refused to stand on his toes or heels while holding onto the examining table due to pain in his knee, and when asked to squat, plaintiff bent his knees very slightly and reported pain. (Id.) He could dress and undress, and was able to get on and off the examining table without help. (Id.)

Examination of plaintiff's neck revealed very little motion in any direction, but during the interview, plaintiff moved his head and neck without any obvious difficulty. (Id.) Upon examination of plaintiff's back, he appeared very uncomfortable as he tried to tilt from side to side, but demonstrated no significant sideward motion. (Tr. 342). Plaintiff complained of tenderness in the lumbar region generally. (Id.) Examination of plaintiff's right shoulder revealed some restriction of overhead motion with complaints of pain as any assistance was given beyond the noted measurements. (Id.) The left shoulder had normal range of motion with assistance, and both shoulders were stable. (Id.) Plaintiff had normal range of motion of the remainder of his upper extremities. (Tr. 342). Dr. Tippett could not adequately examine plaintiff's hips because plaintiff complained of excessive pain

with even gentle manipulation.  (<u>Id.</u>)  Dr. Tippett wrote that he noted plaintiff to sit normally in a chair and to stand normally with his hips extended as he walked.  (<u>Id.</u>)  Examination of plaintiff's right knee revealed normal appearance, similar to the left, with no ligamentous laxity.  (Tr. 342-43).  Plaintiff could straighten his right knee completely and flex it to 140 degrees, and there was no swelling.  (Tr. 343).  Plaintiff was tender throughout the right knee generally.  (<u>Id.</u>)  The left knee had normal range of motion with no tenderness, swelling or instability. (<u>Id.</u>)  Plaintiff's feet and ankles were within normal limits. (<u>Id.</u>)  Plaintiff subsequently reported having had an operation on his right hand and on the left side of his head above his ear. (Tr. 343).  Dr. Tippett wrote that neither of these areas were noted to be unusual during the physical examination.  (<u>Id.</u>)  Dr. Tippett assessed plaintiff with chronic low back pain, chronic knee pain with a history suggestive of possible instability in the right knee with arthroscopic correction.  (<u>Id.</u>)

On October 19, 2007, plaintiff was seen at the Myrtle Hilliard Davis Comprehensive Health Center ("Myrtle Hilliard Clinic") by Shaukat Chaudhry with complaints of a stomach ache, cramping and pain, and diarrhea.  (Tr. 373).  Upon examination, he had no neck stiffness, and no localized joint pain.  (Tr. 374). His back was not tender.  (Tr. 375).

On October 25, 2007, plaintiff was seen at the Myrtle Hilliard Clinic with complaints of lower abdominal pain and cramps, diarrhea, and vomiting.  (Tr. 370).  Examination of plaintiff's

neck demonstrated no decrease in suppleness, and plaintiff's back was normal. (Tr. 371).

On November 2, 2007, plaintiff was seen at the Myrtle Hilliard Clinic with complaints of testicular discomfort. (Tr. 367). It is noted that plaintiff had no localized joint pain and no neck pain. (Id.)

On November 16, 2007, plaintiff was seen in the Urology clinic at ConnectCare with complaints of pain in his scrotum, and a repeat ultrasound was ordered. (Tr. 365, 378, 382).

On February 21, 2008, plaintiff was seen at the Myrtle Hilliard Clinic with complaints of a sore throat, nasal congestion with post nasal drip and fullness in both ears, and scrotal swelling. (Tr. 362). It was noted that plaintiff was not taking medications. (Id.) He was noted to be in no overt distress, but voiced complaints of scrotal and perineal pain, and discomfort due to nasal congestion. (Id.) Plaintiff was assessed with acute sinusitis and nonspecific prostatitis, and given Tramadol, a nasal spray, and an antibiotic. (Tr. 363).

X-rays of plaintiff's right knee and lumbar spine, taken on January 5, 2009, revealed early changes of minimal osteoarthritis of the right knee, and marked degenerative osteoarthritis of facet joints between L4 and L5; early changes of mild degenerative disc disease from L2 to L4, and minimal degenerative arthritis of the left sacroiliac joint. (Tr. 358).[17]

---

[17]The ALJ in this case issued his decision on February 26, 2009. (Tr. 10-16).

An MRI of plaintiff's right knee, taken at St. Louis University Hospital on June 2, 2009, revealed a complete tear of the ACL and a grade 1 sprain of the medial collateral ligament, contusions in the medial femoral condyle and medial tibial plateau, joint effusion, and suggestion of patellar tendon sprain near the tibial attachment. (Tr. 384).

On July 14, 2009, plaintiff was seen at St. Louis University Hospital with complaints of right knee pain and instability. (Tr. 398). (Id.) It was noted that plaintiff had a torn ACL, cartilage tears, and a meniscus tear on the medial side, and surgery was scheduled. (Id.) On July 29, 2009, plaintiff underwent arthroscopic right knee surgery at St. Louis University Hospital. (Tr. 389). Plaintiff returned on August 6, 2009 for follow-up, and it was noted that he was to begin physical therapy. (Tr. 392). Plaintiff returned on August 18, 2009 with a -5 degree extension lag, but improved effusion. (Tr. 391). It was noted that plaintiff was using crutches. (Id.) On September 10, 2009 he returned for follow-up, and was noted to be limping. (Tr. 390). It was noted that he continued to participate in therapy, and that additional surgery was not an option. (Id.)

On September 15, 2009, David Kieffer, M.D., wrote an off-work slip for plaintiff, indicating that plaintiff was "100% total disability." (Tr. 388).

### III.   The ALJ's Decision

The ALJ in this case determined that plaintiff had not engaged in substantial gainful activity since June 17, 2007. (Tr.

15).  The ALJ reviewed the medical evidence of record and determined that plaintiff had the severe impairments of degenerative disc disease of the lumbosacral spine and degenerative joint disease of the knees and prostatitis, but that no impairment or combination of impairments met or medically equaled a listed impairment.  (<u>Id.</u>)  Citing 20 C.F.R. §§ 404.1529 and 416.929, and noting that these Regulations incorporated and expanded upon <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984) and Social Security Rulings 96-4p and 96-7p (Tr. 11), the ALJ discussed all of the medical evidence of record, noted inconsistencies in the record, and discredited plaintiff's subjective complaints of pain precluding all work.  (Tr. 12-15).

The ALJ determined that plaintiff retained the residual functional capacity (also "RFC")to perform the full range of light work, which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  (Tr. 13, 15).  20 C.F.R. §§ 404.1567(b) and 416.967(b). The ALJ wrote that there were no credible, medically-established mental or other non-exertional limitations.  (Tr. 15).

The ALJ then made alternate step four and step five findings.  The ALJ first determined that the impairments established in this case did not prevent plaintiff from performing his past relevant work as a security guard, (Tr. 13), and also noted that plaintiff's past relevant work as a security guard did not require the performance of work-related activities precluded by the limitations described in the ALJ's RFC determination, and that

-20-

plaintiff's impairments did not prevent him from performing his past relevant work as a security guard. (Tr. 16). The ALJ then made an alternate finding by proceeding to step five of the sequential evaluation process. The ALJ wrote: "[e]ven if one were to find the security guard job to require more than light work, such that the claimant could not do any past relevant work, and/or that the claimant had additional limitations against doing more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling . . . the claimant would still not be disabled." (Tr. 14). The ALJ wrote that plaintiff would be "'not disabled' within the framework of 20 C.F.R. 404.1569 and 416.969 and Rules 202.13-202.15 in Table No. 2 of Appendix 2, Subpart P, Regulations No. 4 considering also his 'closely approaching advanced' age and high school equivalent education, irrespective of whether or not he has transferable job skills." (Tr. 14-15). The ALJ concluded that plaintiff was not under a disability, as such is defined in the Social Security Act, at any time through the date of the decision. (Tr. 16).

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled.

Finally, at the fifth step, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

In the case at bar, plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ failed to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on plaintiff's occupational base. In support, plaintiff contends that vocational expert testimony was necessary because plaintiff

suffered from pain, a non-exertional impairment. Plaintiff further contends that the ALJ failed to fulfill his duty to fully and fairly develop the record with regard to plaintiff's past relevant work as a security guard. Finally, plaintiff contends that the ALJ failed to properly consider plaintiff's pain, arguing that the ALJ failed to consider plaintiff's MRI results and other medical observations, and that the ALJ lacked the benefit of the more recent radiological studies and Dr. Kieffer's opinion that plaintiff was disabled. In response, the Commissioner contends that substantial evidence supports the ALJ's decision.

A.    Credibility Determination

Before addressing plaintiff's other arguments, the undersigned will address plaintiff's contention that the ALJ failed to properly consider his complaints of pain. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (in determining RFC, ALJ must first evaluate claimant's credibility and then take into account all relevant evidence, including medical records, and observations of treating physicians and others). Review of the ALJ's credibility determination reveals no error.

In Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit set forth the standard to be followed when evaluating a claimant's subjective complaints of pain and other symptoms. In Polaski, the Eighth Circuit held the ALJ must consider "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating

factors; and functional restrictions." Medhaug v. Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (citing Polaski, 739 F.2d at 1322). Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence. Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008). The ALJ is not required to discuss each Polaski factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)).

In this case, the ALJ weighed the Polaski factors and concluded that plaintiff's allegations were not fully credible for a number of reasons. "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008).

The ALJ noted that, during the relevant time period (plaintiff's amended alleged onset date is June 17, 2007), plaintiff sought and received medical treatment for complaints of pain and swelling in his testicles, but did not seek regular, ongoing treatment for knee or back pain. See (Tr. 198, 200-02, 291-301, 362-75, 378, 382). The ALJ noted that plaintiff had outpatient treatment for gastroenteritis twice in October of 2007, and had no specific musculoskeletal complaints at that time. The ALJ noted that plaintiff was treated for a urinary tract infection

on November 2, 2007, and renewed his complaints of testicular pain later that month. The ALJ noted that there was no evidence that the lack of ongoing medical treatment was related to an inability to pay. The absence of ongoing medical treatment is inconsistent with subjective complaints of pain. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (a claimant's subjective allegations may be discredited by evidence they have received minimal medical treatment and/or has taken only occasional pain medications); see also Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992); see also Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subjective complaints of disabling conditions).

The ALJ also noted that plaintiff did not complain of disabling knee or back pain when receiving the foregoing treatment. See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no complaints made about such pain while receiving other treatment).

The ALJ also noted that plaintiff's daily activities were restricted much more by his choice than by any apparent medical proscription. This finding was proper. A record, such as that in the case at bar, that does not reflect physician imposed restrictions during the relevant time frame suggests that the claimant's restrictions in daily activities are self-imposed rather

than restricted by medical necessity.[18]  See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (adverse credibility determination supported by finding that no physician had imposed any work-related restrictions); see also Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day"); Fredrickson v. Barnhart, 359 F.3d 972, 977 n. 2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily").  The undersigned therefore concludes that the ALJ properly considered plaintiff's daily activities upon choosing to discredit his complaints of debilitating pain.  The undersigned finds that substantial evidence supports the ALJ's decision in this regard.

The ALJ also noted that plaintiff was treated for sinusitis and scrotal pain on February 21, 2008, but was taking no medications.  The lack of prescription medication is inconsistent with allegations of disabling impairments.  Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999).

Plaintiff argues that the ALJ failed to consider "the multiple MRI's," and cites to the following pages from the Administrative Transcript:  156 (October 1, 2004 MRI of plaintiff's left knee), 158-59 (October 1, 2004 MRI of plaintiff's right knee), 160 (September 14, 2004 MRI of plaintiff's lumbar spine.

---

[18]The record does contain a physician's opinion that plaintiff was disabled, but this opinion post-dates the ALJ's decision, and will be addressed herein, infra.

(Plaintiff's Brief at page 11).  However, in his decision, the ALJ specifically wrote that he had considered plaintiff's September 14, 2004 and October 1, 2004 MRI results. (Tr. 12).  The ALJ noted that, while plaintiff may have ACL tears in his knees and degenerative disc disease in his back, the preponderance of the clinical evidence shows no functional loss in these areas.

Plaintiff also argues that the ALJ ignored objective medical observations including muscle spasms, positive straight-leg raise, and decreased sensation at the L2 distribution, citing to pages 233, 225-26 and 229 of the Administrative Transcript. (Id.) However, in his decision, the ALJ exhaustively discussed all of the medical evidence of record, and the ALJ's failure to cite to the specific evidence plaintiff cites does not mean that the ALJ failed to consider it.  See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (the ALJ is not required to discuss in detail every piece of evidence submitted, and a failure to cite to certain evidence does not mean it was not considered).

Regarding plaintiff's prostatitis, the ALJ noted that the medical evidence demonstrated that it was a periodically symptomatic thing and not a chronic, severe one.  The ALJ also noted that all other physical impairments were minor or acute illnesses or injuries resulting in no long-term limitations or complications.  The ALJ noted that the medical evidence reflected no prescription for a cane, and that Dr. Tippett noted that plaintiff did not use one.  The ALJ noted Dr. Tippett's observations regarding plaintiff's lack of cooperation during

testing, and the fact that he limped while in the examination room but not when leaving it. The ALJ noted that such evidence suggested an element of exaggeration on claimant's part. An ALJ may discount a claimant's allegations if there is evidence that he is a malinger or was exaggerating symptoms for financial gain. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

Plaintiff also alleges error in the fact that the ALJ did not consider, and lacked the benefit of, the MRI recorded at page 384 of the Administrative Transcript, which is the June 2, 2009 MRI of plaintiff's right knee. (Plaintiff's Brief at page 11). Obviously, this MRI was not considered by the ALJ because it was performed after the ALJ's February 26, 2009 decision. Plaintiff also argues that the ALJ lacked the benefit of the opinion of Dr. Kieffer that plaintiff was 100% disabled, and the records of plaintiff's knee surgery. (Plaintiff's Brief, page 11). Plaintiff notes that the knee surgery records are significant because "as far back as December 18, 2006, David Clifford, M.D., neurologist, confirmed plaintiff required right knee surgery. (Tr. 225-26)." (Id.) As noted above, both the June 2, 2009 MRI and Dr. Kieffer's opinion were submitted to the Appeals Council.

The Appeals Council must consider additional evidence when it is new, material, and related to the period on or before the ALJ's decision. See 20 C.F.R. §§ 404.970(b), 416.1470(b); Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000). Evidence is material when it relates to the claimant's condition for the time period for which benefits were denied, and not to "after-

acquired conditions or post-decision deterioration of a pre-existing condition." Bergmann, 207 F.3d at 1069-70. The timing of the examination is not dispositive; rather, medical evidence obtained after an ALJ's decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).

As noted above, pages 225 and 226 of the Administrative Transcript, the pages plaintiff cites in support of his statement that Dr. Clifford "confirmed plaintiff required right knee surgery," reflect plaintiff's visit to Dr. Clifford at ConnectCare on December 8, 2006. In the portion of his decision wherein the ALJ discussed the ConnectCare records, the ALJ, apparently noting this treatment note, wrote: "[t]here were still symptoms of right sacroiliitis as of December 2006." (Tr. 12). After reviewing Dr. Clifford's treatment note, the undersigned was unable to find any reference confirming that Dr. Clifford opined that plaintiff required right knee surgery, as plaintiff asserts. See (Tr. 225-26). While Dr. Clifford indicated right knee surgery in the "Problem List" section of this treatment note, this appears to be a reference to plaintiff's history of knee surgery, not a recommendation that plaintiff undergo knee surgery. The undersigned notes that a portion of Dr. Clifford's note on page 226 is blacked out. However, plaintiff makes no mention of the blacked-out portion, and the undersigned notes that the remainder of the treatment note at pages 225 to 226 reflect plaintiff's complaints of back pain, and further reflect Dr. Clifford's

diagnosis of sacroiliitis and musculoskeletal low back pain. See (Tr. 225-26). Given this, it seems unlikely that the blacked out portion contains Dr. Clifford's recommendation that plaintiff undergo right knee surgery. The undersigned concludes that Dr. Clifford did not confirm that plaintiff required right knee surgery, as plaintiff suggests.

The undersigned determines that the evidence plaintiff cites, which is part of the evidence submitted to the Appeals Council following the ALJ's unfavorable decision, does not overcome the ALJ's credibility or RFC determinations. Review of the medical evidence reveals that, on January 5, 2009, a time which was after plaintiff's amended alleged onset date but before the ALJ issued his decision, x-rays of plaintiff's right knee revealed early changes of minimal osteoarthritis. (Tr. 358). In addition, as discussed in detail above, plaintiff's medical records preceding this date reveal minimal, conservative medical treatment relative to plaintiff's right knee and back, and fail to document that any doctor ever told plaintiff that he should not work or that he should restrict his activities. After the ALJ's decision, however, it is obvious that plaintiff's right knee condition either markedly deteriorated or that plaintiff suffered a severe exacerbation. The June 2, 2009 MRI of plaintiff's right knee revealed a complete tear of the ACL and a grade 1 sprain of the medial collateral ligament, contusions in the medial femoral condyle and medial tibial plateau, joint effusion, and suggestion of patellar tendon sprain near the tibial attachment. (Tr. 384). Based upon these findings, surgery

was recommended and performed, and on September 15, 2009, Dr. Kieffer wrote that plaintiff was "100% total disability." (Tr. 388-92). The remainder of the records submitted to the Appeals Council relate to plaintiff's treatment for testicular complaints.

The undersigned believes that the June 2, 2009 MRI and subsequent medical records, including the records of plaintiff's right knee surgery and the opinion of Dr. Kieffer, did not clearly relate to plaintiff's right knee condition on or before the ALJ's February 26, 2009 decision. While plaintiff had degenerative joint disease in his right knee during the time leading up to the date of the ALJ's decision, the findings detailed in the June 2, 2009 MRI and in the records detailing plaintiff's knee surgery and post-operative care were new and very different from the radiological studies performed on January 5, 2009, and from the medical records detailing plaintiff's treatment relative to his right knee before the ALJ issued his decision. The undersigned concludes that it was reasonable for the Appeals Council to determine that the records provided no basis for changing the ALJ's decision. See Bergmann, 207 F.3d at 1069-70; Basinger, 725 F.2d at 1169. The undersigned further concludes that the additional evidence plaintiff cites does not overcome the evidence supporting the ALJ's credibility or RFC determinations. Id.

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies

detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ considered the <u>Polaski</u> factors and discredited plaintiff's subjective complaints for good reasons, that decision should be upheld. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001). The decision "of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain" should not be disturbed. <u>Reed v. Sullivan</u>, 988 F.2d 812, 815 (8th Cir. 1993) (citations omitted).

    B.  <u>RFC Determination</u>

      In the case at bar, the ALJ determined that plaintiff retained the RFC to perform the full range of light work, which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. (Tr. 13, 15). 20 C.F.R. §§ 404.1567(b) and 416.967(b). The ALJ wrote that there were no credible, medically-established mental or other non-exertional limitations. (Tr. 15). As discussed above, the ALJ made alternate step four and step five findings, first determining that plaintiff's RFC did not preclude the performance of his past work as a security guard, and subsequently determining that plaintiff was not disabled within the framework of 20 C.F.R. 404.1569 and 416.969 and Rules 202.13-202.15 in Table No. 2 of Appendix 2, Subpart P, Regulations No. 4. Plaintiff challenges the ALJ's decision, inasmuch as the ALJ erroneously failed to obtain vocational expert testimony; failed to fully and fairly develop the

record; and failed to properly consider plaintiff's allegations of pain. Review of the record reveals that the ALJ's decision is supported by substantial evidence on the record as a whole.

Residual functional capacity describes what a claimant remains able to do despite her limitations. 20 C.F.R. § 404.1545; Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793. A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).

An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. "The claimant has the burden to prove his residual functional capacity." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (citing Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)).

In the case at bar, in determining plaintiff's RFC, the ALJ exhaustively discussed the medical evidence of record, and determined that the objective medical evidence did not support plaintiff's allegations of disabling pain in his lower back and right knee. The ALJ noted that, during the relevant time period, the preponderance of the medical evidence is related to plaintiff's treatment for complaints of pain and swelling in his testicles, and not for complaints of pain in his back or knees. <u>See</u> (Tr. 198, 200-02, 291-301, 362-75, 378, 382). As the ALJ noted, while plaintiff complained of stabbing pain in his back during a time preceding his amended onset date, x-rays revealed only degenerative changes. (Tr. 238). A January 5, 2009 x-ray of plaintiff's back revealed bilateral sacralization of L5, marked degenerative osteoarthritis of facet joints between L4 and L5, early mild degenerative disc disease from L2 to L4, and minimal degenerative arthritis of the left sacroiliac joint. (Tr. 358). X-ray of plaintiff's right knee performed on this same date revealed only early changes of minimal osteoarthritis of the right knee. (<u>Id.</u>)

The ALJ also noted that, when plaintiff was seen by Dr. Tippett, he arose from a chair easily, and had a limp while in the examination room but not when leaving it. The ALJ noted that plaintiff moved his neck without obvious difficulty, and had normal range of motion in both knees with no signs of swelling. The ALJ noted that all other physical signs and test results were normal or unremarkable, and noted that plaintiff did not have most of the signs associated with chronic, severe musculoskeletal pain such as

muscle atrophy, persistent or frequently recurring muscle spasms (Dr. Tippett noted none), obvious or consistently reproducible neurological deficits such as motor, sensory or reflex loss, or other signs of nerve root impingement. While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257-58 (8th Cir. 1997); <u>Cruse</u>, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); <u>Battles</u>, 902 F.2d at 659 (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time).

The ALJ also noted that no doctor who treated or examined plaintiff stated or implied that he was disabled or totally incapacitated, and that no such doctor placed any specific long-term limitations on plaintiff's abilities to stand, sit, walk, bend, lift, carry, or do other basic exertional activities.[19] <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in

---

[19]While the record does contain records submitted to the Appeals Council following the issuance of the ALJ's decision that do contain such an opinion, as will be addressed, <u>infra</u>, the undersigned is now addressing those records that were part of the record and were considered by the ALJ, and that related to plaintiff's condition during the relevant time period.

the record for the ALJ's determination); <u>Young</u>, 221 F.3d at 1069 (it is significant that no examining physician submitted a medical conclusion that claimant is disabled or unable to work); <u>Edwards v. Secretary of Health & Human Servs.</u>, 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints).

Furthermore, as discussed above, the ALJ properly discredited plaintiff's subjective complaints after undertaking the proper analysis. An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC. See <u>McGeorge v. Barnhart</u>, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record").

1. <u>Vocational Expert Testimony</u>

Plaintiff also argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because the ALJ failed to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on plaintiff's occupational base. In support, plaintiff argues that he suffered from pain, a non-exertional impairment, and vocational expert testimony was therefore required. Review of the ALJ's decision reveals that the ALJ properly applied the Medical-Vocational Guidelines to determine if plaintiff could make an adjustment to other work.

As noted above, in the case at bar, the ALJ made

alternate step five findings, using the Guidelines to direct a finding that plaintiff was not disabled. Generally, when a claimant suffers from a non-exertional impairment such as pain, the ALJ must obtain vocational expert testimony instead of relying upon the Medical-Vocational Guidelines. Baker v. Barnhart, 457 F.3d 882, 894 (8th Cir. 2006) (citing Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005)). However, when the ALJ explicitly discredits a claimant's subjective complaints of pain for legally sufficient reasons, the Commissioner's burden at step five may be met by the use of the Medical-Vocational Guidelines. Baker, 457 F.3d at 895 (citations omitted).

As discussed in detail above, the ALJ in this case explicitly discredited plaintiff's subjective complaints of pain for legally sufficient reasons. He was therefore free to use the Guidelines to meet his step five burden. See Id. According to the Regulations, plaintiff fit the definition of an individual "closely approaching advanced age" beginning on his amended alleged onset date, when he turned fifty. 20 C.F.R. §§ 404.1563(d), 416.963(d). He had a high school-equivalent education, (Tr. 132), and, as properly determined by the ALJ, he retained the RFC to perform the full range of light work. (Tr. 13). The Medical-Vocational Guidelines, therefore, directed a finding of "not disabled," as the ALJ determined in his alternate finding. See 20 C.F.R. pt. 404, Subpt. P, App. 2, Rules 202.13-202.15 of Table No. 2. The undersigned concludes that the ALJ's use of the Medical-Vocational Guidelines was therefore proper. See Id.

Plaintiff also argues that the ALJ failed to fully and fairly develop the record with regard to plaintiff's past work as a security guard.  In response, the Commissioner contends that these arguments are moot because the ALJ alternately, and properly, determined at step five that the Guidelines directed a finding of not disabled.

The undersigned notes that an ALJ is required to make explicit findings regarding the actual physical and mental demands of plaintiff's past work and compare them with her residual functional capacity, <u>Groeper v. Sullivan</u>, 932 F.2d 1234 (8th Cir. 1991), and the ALJ in this case did not make such findings. However, the ALJ in this case made an alternate step five finding which, as discussed above, was legally sufficient.  Therefore, even though the ALJ's findings with regard to step four were arguably deficient, the ALJ went on to determine at step five that plaintiff was not disabled, and that determination was supported by substantial evidence.  <u>See</u>  <u>Gray v. Astrue</u>, 2008 WL 4816986, 8 (W.D.Mo., 2008) (remand was not warranted, even though the ALJ's findings at step four were deficient, because the ALJ made alternative findings at step five that were supported by substantial evidence); <u>see also</u> <u>Baker</u>, 457 F.3d at 895 (the absence of an express finding at step four did not prejudice the claimant with respect to burden-shifting at step five because the use of the Guidelines was sufficient to meet the Commissioner's burden).

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the

Commissioner be affirmed, and that plaintiff's Complaint be dismissed.

The parties are advised that they have to and including February 25, 2011, to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of February, 2011.